

*U.S. Department of Justice*

*United States Attorney*
*Southern District of New York*

---

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

May 20, 2022

**BY ECF**
The Honorable Lewis A. Kaplan
United States District Judge
Southern District of New York
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street
New York, New York 10007

>   Re:   *United States v. Rickey Johnson*, S1 21 Cr. 194 (LAK)

Dear Judge Kaplan:

   The Government respectfully submits this letter in advance of the May 25, 2022 sentencing of defendant Rickey Johnson. For the reasons set forth below, the Government submits that the applicable Guidelines range is 41 to 51 months' imprisonment, and that a sentence within that range would be sufficient but not greater than necessary to serve the purposes of sentencing.

   I.   **OFFENSE CONDUCT**

   As the Court is aware from the evidence at trial, the defendant used his Instagram account to send messages and post videos in which he threatened to kill television commentators and elected officials. The first such threat with which the defendant was charged was made on January 30, 2021, when he used his Instagram account to send direct, private messages to Fox News contributor Greg Gutfeld. (Presentence Investigation Report ("PSR") ¶ 10). In these messages, the defendant wrote: "you will be killed." (PSR ¶ 10). He also instructed Gutfeld to "tell jesse and katie. and cannot find their pages[.] they will be killed as well"—an apparent reference to Jesse Waters and Katie Pavlich, Gutfeld's co-hosts on the Fox News program "the Five." (PSR ¶ 10). After Gutfeld noticed a comment on the defendant's Instagram account that Gutfeld understood to mean that the defendant was in Manhattan—where Gutfeld films his show—Gutfeld forwarded the messages to the Director of Corporate Security at Fox News, titling the email "Death threat." (PSR ¶¶ 10–11; Trial Tr. 204:24–205:3).

   Four days later, the defendant used the same Instagram account to post a series of videos in which he threatened to kill Gutfeld, Fox News host Laura Ingraham, and United States Senator Joe Manchin. In each video, the defendant showed footage from Fox News while narrating the threats in the background. (PSR ¶ 12). The defendant publicly posted each video. (PSR ¶ 12).

   The first video began by showing a clip from "the Five" in which Senator Manchin was interviewed. (PSR ¶ 13). When Senator Manchin appeared on the screen, the defendant declared: "He's dead. He is fucking dead. He's a Republican that wants to defund the people." (PSR ¶ 13).

The defendant continued: "Joe Manchin will be executed . . . . I'm killing their ass.  You think I'm joking.  And you gonna know I fucking did it."  (PSR ¶ 13).  When the defendant posted the video, he "tagged" Senator Manchin's official account in the caption, writing "bitch, you, are a terrorist, and will, be held accountable for your treason."  (PSR ¶ 13).  The NYPD alerted the U.S. Capitol Police to the threat, and the Capitol Police immediately contacted Senator Manchin's office and local law enforcement to arrange for additional patrols at Senator Manchin's residence.  (PSR ¶ 14).

The defendant also threatened Gutfeld in the same video.  When Gutfeld appeared on the screen, the defendant stated: "Aye, Greg Gutfeld, what the fuck were you thinking when you stepped to me in SoHo?", which Fox News's Director of Corporate Security understood to refer to seeing Gutfeld in the Manhattan neighborhood of SoHo.  (PSR ¶ 15).  The defendant continued in the video by telling Gutfeld: "You know how y'all sit and talk about and support the people who use the Constitution to kill people?  I am going to take your life.  I am going to tell you before I do it, like I am doing right now, but I'm gonna look you in your fucking eye, and I'm gonna take your fucking life, and everyone that knows I took your life is gonna know why."  (PSR ¶ 15).

The defendant similarly threatened Laura Ingraham in two videos he posted that day, showing footage from her show ("The Ingraham Angle") while declaring:

- "Laura Ingraham, you will be killed. . . . I want you dead. . . . You are a racist, domestic terrorist."

- "I want this white woman dead. . . . I want Laura Ingraham dead. . . . I'm gonna kill you, Laura Ingraham."

- "Laura Ingraham, I am going to personally kill you."

- "Laura Ingraham, I'm going to kill you with my bare hands.  It's not insane, it's an American.  And you're an enemy to the American society."

(PSR ¶¶ 16–17).

Members of the NYPD arrested the defendant on February 11, 2021, and recovered a cell phone from his pocket that was logged into the Instagram account that he used to send the threatening messages and post the threatening videos.  (PSR ¶ 18).  The defendant ultimately proceeded to trial, where a jury convicted him of two counts of making interstate threats, in violation of 18 U.S.C. § 875(c)—based on his threats to Gutfeld and Ingraham—and one count of threatening a public official, in violation of 18 U.S.C. § 115(a)(1)(B), based on his threats to Senator Manchin.  (PSR ¶ 6).  The jury acquitted the defendant of one additional count of threatening a public official.  That count was based on statements the defendant directed at United States Representative Lauren Boebert in one of the videos that showed coverage from "The Ingraham Angle."  In that video, the defendant threatened Representative Boebert, declaring: "Smile, I am going to kill you.  You are proud to terrorize the United States Constitution."  (PSR ¶ 16).

## II. PSR GUIDELINES CALCULATION

The PSR calculated the defendant's Guidelines range as follows:

- The offense level for Counts One and Four (making threatening interstate communications to Gutfeld and Ingraham) is 12. *See* U.S.S.G. § 2A6.1(a)(1).

- With respect to Count Two (threatening Senator Manchin), the base offense level is 12. *See id.* Two levels are added because the defendant was convicted under 18 U.S.C. § 115, made a public threatening communication, and knew or should have known that the public threatening communication created a substantial risk of inciting others to violate 18 U.S.C. § 115. *Id.* § 2A6.1(b)(5). Six levels are added because the victim was a government officer, the offense of conviction was motivated by such status, and the applicable guideline is from Chapter Two, Part A. *Id.* § 3A1.2(b). The total offense level for Count Two is 20.

- Because the counts involved different victims, they do not group. *Id.* § 3D1.2. Under U.S.S.G. § 3D1.4, the counts constitute two units, which result in a total combined offense level of 22. *Id.*

The PSR further found that the defendant has no criminal history points. Accordingly, at offense level 22 and Criminal History Category I, the defendant's Guidelines range is 41 to 51 months. The Government agrees with this calculation. The PSR also recommended a sentence of 24 months; for the reasons described below, the Government believes that a within-Guidelines sentence is appropriate.

## III. DISCUSSION

### A. Applicable Law

Because the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions," district courts must treat the Guidelines as the "starting point and the initial benchmark" in sentencing proceedings. *Gall v. United States*, 552 U.S. 38, 46, 49 (2007). After calculating the Guidelines, the district court must consider the seven factors outlined in 18 U.S.C. § 3553(a): (1) "the nature and circumstances of the offense and the history and characteristics of the defendant"; (2) the four purposes of sentencing, as set forth below; (3) "the kinds of sentences available"; (4) the Guidelines range itself; (5) any relevant policy statement by the Sentencing Commission; (6) "the need to avoid unwarranted sentence disparities among defendants"; and (7) "the need to provide restitution to any victims."

In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

>   (B) to afford adequate deterrence to criminal conduct;
>
>   (C) to protect the public from further crimes of the defendant; and
>
>   (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

"In the ordinary case, the [U.S. Sentencing] Commission's recommendation of a sentencing range will reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives." *Kimbrough v. United States*, 552 U.S. 85, 109 (2007); *see also United States v. Bryant*, 976 F.3d 165, 181 (2d Cir. 2020) ("In the overwhelming majority of cases, a Guidelines sentence will fall comfortably within the broad range of sentences that would be reasonable in the particular circumstances." (quoting *United States v. Fernandez*, 443 F.3d 19, 27 (2d Cir. 2006))).

### B. The Defendant's Guidelines Range Is 41 to 51 Months

The defense objects to one aspect of the PSR's Guidelines calculation: the application of Section 2A6.1(b)(5), which provides a two-level enhancement when "the defendant (A) is convicted under 18 U.S.C. § 115, (B) made a public threatening communication, and (C) knew or should have known that the public threatening communication created a substantial risk of inciting others to violate 18 U.S.C. § 115." Emphasizing that the defendant had only one Instagram "follower" and the video threatening Senator Manchin received only six views, the defense asserts that the defendant did not create a "substantial risk of inciting others to violate 18 U.S.C. § 115." (Def. Ltr. at 2–4).

The Sentencing Commission added Section 2A6.1(b)(5) in response to a 2007 directive from Congress to evaluate whether, and by how much, punishment should be increased for threats made to federal officials over the internet. *See* Court Security Improvement Act of 2007, Pub. L. No. 110-177, § 209, 121 Stat. 2534, 2538 (2007); *see also* U.S.S.G. § 2A6.1, App. Notes ("Subsection (b)(5) implements, in a broader form, the directive to the Commission in section 209 of the Court Security Improvement Act of 2007."). In explaining the basis for the two-level enhancement, the Sentencing Commission wrote that the "policy concerns" underlying Congress's directive regarding internet threats "apply equally to threats made public by other means."[1] The Sentencing Commission thus recognized the need to punish publicly-posted threats more severely than those made privately, given the risk that others will follow suit. No other enhancement accounts for whether the threat was publicly made.

The facts of this case satisfy the enhancement. The defendant was convicted under § 115, and there is no question that the threat was public. (PSR ¶ 13). And the way the defendant made the threat created a substantial risk that others would threaten Senator Manchin. The defendant "tagged" Senator Manchin's official Instagram page. (PSR ¶ 13). He accused Senator Manchin,

---

[1] *See* United States Sentencing Commission, *Amendments to the Sentencing Guidelines* (May 1, 2009), *available at* https://www.ussc.gov/sites/default/files/pdf/amendment-process/reader-friendly-amendments/20090501_RF_Amendments_0.pdf.

both in the video and in the written post accompanying the video, of attempting "to defund the people." (PSR ¶ 13). And he called Senator Manchin a "terrorist" and told him that he would "be executed." (PSR ¶ 13). Through his words, the defendant attempted to evoke a sense of shared grievance, and he made clear what his ultimate objective was: "Joe Manchin will be executed. . . . You think I'm joking. And you gonna know I fucking did it." At a minimum, applying the applicable preponderance of the evidence standard, the defendant "should have known" that his public threats created a substantial risk that others would follow suit.

### C. A Within-Guidelines Sentence Is Appropriate

A within-Guidelines sentence is appropriate, first, to reflect the seriousness of the offense. The defendant's threats were direct and unequivocal: "Laura Ingraham, I am going to kill you with my bare hands"; "Joe Manchin will be executed"; "I'm gonna look you in your fucking eye, and I'm gonna take your fucking life, and everyone that knows I took your life is gonna know why." The defendant's words left no room for interpretation, and his tone underscored that he was not speaking metaphorically. He told his victims that he was going to end their lives. As is evident from Gutfeld's reaction to the threats, the defendant was believed.

The defense argued at trial, and reiterated in their submission, that the defendant had no access to firearms, took no steps toward carrying out his death threats, and was simply "express[ing] his views and frustrations." (*E.g.*, Trial Tr. 395:24–396:1; Def. Ltr. at 1). But none of those things is apparent from the videos. That is precisely why the defendant's crimes are serious: there is no way of knowing whether the individual posting the video had in fact taken steps to carry out the threats. Victims and law enforcement are left to guess whether the threats are simply words or a concrete promise of action, and the defendant's videos gave every reason to believe they were very real. As Special Agent Brandon Kelley from the Capitol Police testified, these threats were treated as the most serious that the Capitol Police evaluates. (Trial Tr. 44:11–45:22; 144:12–145:8). Agent Kelley, who is trained in threat assessment, took the threats seriously because of the specific, concrete language the defendant used. (Trial Tr. 58:5–11; 142:9–12). The defendant indicated a willingness in one of his threats to bring his conduct into the real world: in the video threatening Gutfeld, the defendant mentioned interacting with Gutfeld in the neighborhood where he lived. (Trial Tr. 208:15–20). And, as the jury necessarily found, the defendant knew his statements would be viewed as threats. (*E.g.*, Trial Tr. 438:17–19). The evidence showed that the defendant's statements were not a heat-of-the-moment expression of political belief that went too far; after all, he posted the videos four days after making the initial threat to Gutfeld. He made these repeated, explicit, and terrifying threats to intimidate his victims. Words have meaning, and the defendant's words had the desired effect.

Had the defendant confined his threats to an obscure internet message board, where none of his victims were likely to stumble upon them, his argument that he was simply expressing frustration might have more traction. But he chose to communicate his threats in a different way. He sent multiple direct, private messages to Gutfeld on a Saturday morning—directing Gutfeld to share the threats with his co-hosts—and he tagged Senator Manchin's page. The defendant wanted his victims to see the death threats. He wanted to make his victims afraid. That conduct merits a serious sentence.

The Court must also take into account the need for deterrence. In this case, both general and specific deterrence are relevant considerations. With respect to general deterrence, even the defense elicited testimony at trial that the number of threats directed to public officials has increased over the past several years. (Trial Tr. 177:1–12). The replacement of political discourse with threats of harm is a growing problem where perpetrators often feel all too comfortable that their vitriolic scare tactics will have no consequences. A serious sentence is an important way to make others think twice about threatening to kill an elected official or other public figure.

There is also a need for specific deterrence. One important factor in assessing specific deterrence is whether the defendant has accepted responsibility. In this case, the defendant has not done so. Even after proceeding to trial, the defense submission continues to suggest that the defendant did not commit a crime because his threats were not "serious expressions of an intent to harm." (Def. Ltr. at 11; *see also id.* at 1 ("The language he used was harsh, hyperbolic, and, according to the jury that convicted him, a serious threat.")). The psychological report attached to the defense submission asserts that, although the defendant "maintains certain delusions about his rationale for his justice involvement," it is the author's "professional opinion" that the defendant "genuinely presented that he would not engage in these types of behaviors in the future." (Def. Ltr. Ex. D at 9). But the report provides almost no detail explaining the basis for this belief, which seems to run contrary to the report's detailed descriptions of the defendant's delusions. The Court should give the report little weight. Nothing else in the record suggests that the defendant appreciates the wrongfulness of his conduct and will not repeat it.

It is also largely because the defendant has not accepted responsibility that the cases he cites in support of a time-served sentence are inapposite. In each case the defendant cites, the defendant pled guilty. In all but one of the cases, the defendant faced a Guidelines range in which the top end was 24 months or less. *See United States v. Reed*, 20 Cr. 406, ECF No. 35, at 2 (D. Md.) (6 to 12 months); *United States v. Smocks*, 21 Cr. 198, ECF No. 69, at 3 (D.D.C.) (8 to 14 months); *United States v. Carlineo*, 19 Cr. 6140, ECF Nos. 30, 70 (W.D.N.Y.) (12 to 18 months); *United States v. Brogan*, 19 Cr. 207, ECF No. 21, at 3 (E.D.N.Y.) (18 to 24 months). In the one case where the defendant faced a slightly higher Guidelines range, of 24 to 30 months, the Government agreed to a time-served sentence. *See United States v. Celli*, 19 Cr. 129, ECF No. 175 (E.D.N.Y.). These cases are distinguishable from the instant case, where the defendant elected to proceed to trial and his offense conduct and failure to accept responsibility have resulted in a significantly higher Guidelines range.

In a more recent case in this District that bears noting, Judge Hellerstein imposed a sentence of 36 months. *See United States v. Lemke*, 21 Cr. 100 (AKH). In *Lemke*, the defendant pled guilty to one count of violating Section 875(c) after making specific, graphic threats to journalists and their family members. He faced a Guidelines range of 15 to 21 months, and the Government sought an above-Guidelines sentence based on the repeated and specific nature of the threats. (ECF No. 53 at 43). Rejecting the defendant's claim that the threats were "politically inspired," Judge Hellerstein explained that "[t]hreats to intimidate are not debates." (ECF No. 53 at 44). Although the defendant's threats in *Lemke* extended over a longer period and made repeated, specific references to personal details about journalists and their family members, the defendant pled guilty and accepted responsibility, unlike the defendant in this case. *Lemke* provides an important point of consideration that further supports the imposition of a Guidelines sentence.

## IV. CONCLUSION

For these reasons, the Government respectfully requests that the Court impose a sentence within the applicable Guidelines range of 41 to 51 months' imprisonment.

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney

By: _____
Kyle A. Wirshba
Patrick R. Moroney
Assistant United States Attorneys
Southern District of New York
(212) 637-2493 / 2330

cc (by ECF):   Zawadi Baharanyi, Esq.
               Marisa K. Cabrera, Esq.